IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEFON HARRISON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF CHICAGO, | ) Case No. 20-cv-2918 |
| Former CHICAGO POLICE | ) |
| SERGEANT RONALD WATTS, | ) |
| Former CHICAGO POLICE | ) |
| OFFICER KALLATT MOHAMMED, | ) |
| OFFICER ALVIN JONES, | ) |
| OFFICER ELSWORTH SMITH JR., | ) |
| OFFICER BRIAN BOLTON, | ) |
| OFFICER ROBERT GONZALEZ, | ) |
| PHILIP J. CLINE, DEBRA KIRBY, | ) |
| KAREN ROWAN, and other | ) |
| as-yet-unidentified officers of the | ) |
| Chicago Police Department, | ) |
| | ) |
| Defendants. | )    JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Stefon Harrison, by his attorneys, Loevy & Loevy, hereby complains against

Defendants, City of Chicago, former Chicago Police Sergeant Ronald Watts, former Chicago

Police Officer Kallatt Mohammed, Officer Alvin Jones, Officer Elsworth Smith Jr., Officer

Brian Bolton, Officer Robert Gonzalez, Philip J. Cline, Debra Kirby, Karen Rowan, and other

as-yet-unidentified officers of the Chicago Police Department, and states as follows:

1.      Since January 2016, the Circuit Court of Cook County, Illinois has overturned 95

wrongful convictions tied to Sgt. Ronald Watts and his corrupt team of officers in what Illinois

courts have called one of the most staggering cases of police corruption in the history of Chicago.

Stefon Harrison's wrongful convictions are two of the most recent to be overturned.

2.     Stefon Harrison was convicted of and incarcerated for crimes he did not commit.

3.     The crimes never happened; they were completely fabricated by corrupt Chicago police officers.

4.     Mr. Harrison was first arrested on September 27, 2006.

5.     Mr. Harrison was then arrested again on December 4, 2006.

6.     Both of Mr. Harrison's arrests occurred at the Ida B. Wells housing complex, a location that was heavily policed by corrupt Chicago police officers.

7.     The corrupt officers sought bribes, planted drugs, and falsely accused many people, including Mr. Harrison, of possessing drugs.

8.     In fact, these corrupt officers victimized Mr. Harrison prior to his September and December 2006 arrests. On multiple occasions, Watts and his team had stopped Mr. Harrison, harassed him, and asked him for information about drugs and guns.

9.     The type of encounters these police officers had with Mr. Harrison were unfortunately quite common, and the consequences were dire: false arrests, criminal proceedings, incarcerations, and a subsequent felony record.

10.    Believing that he faced no chance of winning at trial following his September 27 and December 4, 2006 arrests, Mr. Harrison eventually pled guilty to these false charges.

11.    After Mr. Harrison had completed his sentence, Defendants Watts and Mohammed were caught on tape engaging in the exact type of misconduct that Mr. Harrison had alleged against them.

12.    The federal government charged Watts and Mohammed criminally, and the disgraced officers pled guilty and served time in federal prison.

13.    Since then, evidence has come to light showing that Defendant Watts and his crew

– 2 –

engaged in a pattern of criminal misconduct against public housing residents and visitors and that

Chicago Police Department officials have long known about that pattern.

14.     The scope of this misconduct cannot be overstated.

15.     For example, the Chief Justice of Illinois' Court of Claims has written that "many

individuals were wrongfully convicted," explaining that "Watts and his team of police officers ran

what can only be described as a criminal enterprise right out of the movie 'Training Day.'"

16.     The Court of Claims Chief Justice explained that "[o]n many occasions when these

residents [of public housing] refused to pay the extortive demands the Watts crew would fabricate

drug charges against them."

17.     The Illinois Appellate Court, too, has weighed in on the scope of the scandal,

repeatedly calling Watts and his team "corrupt police officers" and "criminals" and chastising the

City's police disciplinary oversight body for doing "nothing to slow down the criminals" from

their rampant misconduct and perjury.

18.     On or around November 16, 2017, the Cook County State's Attorney Office

(CCSAO) successfully moved to vacate the convictions of 15 individuals framed by the Watts

outfit.

19.     In light of that decision by the CCSAO, and recognizing the scope of misconduct

that the City allowed it to flourish for more than a decade unabated, fifteen (15) members of the

Watts crew were placed on desk duty.

20.     Since then, the CCSAO has successfully moved to vacate many more convictions.

21.     As of the filing of this complaint, nearly 100 convictions have been vacated as a

result of the Watts team's misconduct.

22.     In recognition of the scope of their misconduct, the CSSAO will no longer call

many of Watts's team – including Defendants in this case – as witnesses "due to concerns about [their] credibility and alleged involvement in the misconduct of Sergeant Watts."

23.     Through this lawsuit, Mr. Harrison seeks accountability and compensation for being deprived of his liberty as a result of Defendants' misconduct.

**Jurisdiction and Venue**

24.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the Constitution of the United States.

25.     This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and state law claims pursuant to 28 U.S.C. § 1367. Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district and Defendant City of Chicago is a municipal corporation located herein. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

26.     Mr. Harrison is 39 years old. He currently resides in Chicago.

27.     At all times relevant to this complaint, Defendants former Chicago Police Sergeant Ronald Watts, former Chicago Police Officer Kallatt Mohammed, Officer Alvin Jones, Officer Elsworth Smith Jr., Officer Brian Bolton, and Officer Robert Gonzalez were police officers employed by the City of Chicago and acting within the scope of their employment and under the color of law. Collectively, these individual Defendants are referred to as Defendant Officers.

28.     At all relevant times, Defendant Watts was a leader of the Second District Tactical Team that worked the Ida B. Wells housing complex.

29.     Defendants Kallatt Mohammed, Officer Alvin Jones, Officer Elsworth Smith Jr., Officer Brian Bolton, and Officer Robert Gonzalez worked on Watts's tactical team.

30.     At all relevant times, Defendant Phillip J. Cline was the Superintendent of the

– 4 –

Chicago Police Department.

31.     At all relevant times, Defendants Debra Kirby and Karen Rowan were Assistant Deputy Superintendents of the Chicago Police Department, acting as the heads of its Internal Affairs Division (IAD). Collectively, Defendant Kirby, Defendant Cline, and Defendant Rowan are referred to as Defendant Supervisory Officers.

32.     Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois. The City operates the Chicago Police Department (CPD) and is responsible for the policies, practices, and customs of the City and the CPD.

## Factual Background

33.     During the 2000s, Mr. Harrison lived in the Chicago Housing Authority's Ida B. Wells housing complex.

34.     During the times complained of, the Ida B. Wells complex was actively patrolled by a tactical team of CPD officers, led by Defendant Watts.

35.     Watts and his tactical team members were well known to the residents of the Ida B. Wells area.

36.     Watts and his tactical team members maintained a visible presence in the Ida B. Wells area. The Watts team had a reputation in the community for harassing, intimidating, and fabricating criminal charges against the area's residents and visitors.

37.     The Watts team's pattern of harassment continued with Mr. Harrison.

38.     Watts had harassed and threatened Mr. Harrison prior to September 27, 2006.

## Mr. Harrison is Framed on September 27, 2006

39.     On September 27, 2006, Mr. Harrison was walking back to his home when he encountered Watts' Team.

40.     Mr. Harrison was approached by several Defendant Officers. One of the Defendant officers searched Mr. Harrison and did not find anything illegal on him. Mr. Harrison explained that he was simply returning home and protested the search.

41.     Watts then approached Mr. Harrison and the other Defendant Officers. One of the Defendant officers told Watts that Mr. Harrison was complaining about being stopped.

42.     Watts then took a bag of drugs out his own pocket and told the Defendant officers they could use the drugs to frame Mr. Harrison. None of the Defendant Officers disagreed with Watts's suggestion to frame Mr. Harrison.

43.     Mr. Harrison became angry and protested.

44.     Watts pushed him up against a wall and handcuffed him.

45.     Mr. Harrison was wrongfully arrested and taken to the police station.

46.     At the police station, Watts told Mr. Harrison he could get out of the arrest if he could arrange to get Watts drugs or guns. Mr. Harrison told Watts he could do no such thing.

47.     Mr. Harrison was then charged with possession of drugs.

**Mr. Harrison is Framed on December 4, 2006**

48.     While Mr. Harrison was out on bond from his September 27, 2006 arrest, Watts framed him a second time.

49.     On December 4, 2006, Mr. Harrison had just returned to his residence at the Ida B. Wells complex and was waiting for an elevator when he heard a commotion and turned around.

50.     As he turned, Mr. Harrison realized that Defendant Mohammed was standing behind him, along with Defendant Jones, and that Mohammed was pointing a gun at his head.

51.     The Defendants ordered Mr. Harrison to the ground and he did as he was told, fearing for his life.

52.     Mr. Harrison realized that several other officers had also entered the building's lobby and that these officers had several other detained men with them.

53.     The officers searched Mr. Harrison and the other detainees without any probable cause. The officers found nothing illegal on the men.

54.     Watts approached Mr. Harrison and intimated that Harrison should pay him to avoid being arrested.

55.     Mr. Harrison refused Watts's request for money.

56.     Watts then told Mr. Harrison if were not able to produce some drugs or guns for him, he was going to prison.

57.     Mr. Harrison did not have any drugs or guns to give Watts.

58.     Watts then told the officers to arrest all the individuals that had been detained and take them to the police station.

59.     Defendant Officers falsely arrested Mr. Harrison and took his to a police station.

60.     At the police station, Mr. Harrison and the other men were handcuffed to a bench together.

61.     Watts entered the room the men were in and pulled several bags of drugs out of his pocket.

62.     Mr. Harrison pleaded with Watts not to frame him for a crime he did not commit.

63.     Watts then said he would split the drugs up and put some on each of the men.

64.     Watts again told the men that he would let them go if they were able to get him some additional drugs or guns.

65.     None of the men were able to give Watts any drugs or guns.

66.     Mr. Harrison was charged with possession of drugs.

– 7 –

**Mr. Harrison is Prosecuted, Convicted, and Sentenced**

67. The Defendant Officers prepared false and fabricated police reports related to these arrests.

68. On the basis of the false reports, Mr. Harrison was prosecuted for drug crimes.

69. Even though Mr. Harrison was innocent, knowing that he risked significant time in prison if he went to trial and lost, Mr. Harrison accepted a plea deal.

70. Mr. Harrison was sentenced to 4 years in prison.

71. Defendant Officers never disclosed to the prosecutors that they had fabricated evidence and falsified police reports related to Mr. Harrison's arrests.

72. Defendant Officers never disclosed to the prosecutors any of their misconduct described herein. If the prosecutors had known that Defendant Officers fabricated evidence and committed the other misconduct described herein, they would not have pursued the prosecution of Mr. Harrison.

**Defendant Watts and His Team Engaged in a Pattern of Misconduct for at Least a Decade, All Facilitated by the City's Code of Silence**

73. It was no secret within the CPD that Watts and his crew engaged in the type of misconduct described herein.

74. Government officials, including City of Chicago employees, knew about Watts's and his crew's alleged misconduct as early as 1999.

75. Shortly thereafter, an FBI investigation of Watts and his crew was underway. The FBI investigation took place with the knowledge and occasional participation of the Chicago Police Department's Internal Affairs Division (IAD).

76.     Because IAD was kept abreast of the FBI investigation, during the times complained of, City officials—including but not limited to the head of IAD and CPD Superintendent Philip J. Cline—were aware of credible allegations that Watts and his team were extorting and soliciting bribes from drug dealers.

77.     Watts used a drug dealer named "Big Shorty" to run drugs at the Ida B. Wells complex. Big Shorty would sell the drugs, turning profits over to Watts in exchange for Watts's protection. Watts used drug dealers as phony informants to obtain illegitimate search warrants. Watts also offered to let arrestees go if they provided him with weapons, drugs or money.

78.     Targets of the FBI investigation extended beyond Watts to members of Watts's tactical team, including some of the Defendant Officers named herein.

79.     During the times complained of, the FBI investigation generated evidence showing that Watts engaged in systematic extortion, theft, the possession and distribution of drugs for money, planting drugs on subjects, and paying informants with drugs.

80.     Investigators also determined that Watts and his subordinates had engaged in these activities for years.

### Watts and Mohammed are Charged with Federal Crimes

81.     In 2012, after at least a decade of engaging in criminal misconduct, Defendants Watts and Mohammed were caught red-handed, shaking down a person they thought was a drug courier but who was actually an agent for the FBI.

82.     The U.S. government subsequently charged Watts and Mohammed with federal crimes.

83.     Watts and Mohammed each pled guilty to federal criminal charges and both were sentenced to terms of imprisonment. *See United States v. Watts,* No. 12- CR-87-1 (N.D. Ill.);

*United States v. Mohammed*, No. 12-CR-87-2 (N.D. Ill.).

84.     In its sentencing memorandum in the criminal case against Watts, the government explained that "[f]or years… the defendant [Watts] used his badge and his position as a sergeant with the Chicago Police Department to shield his own criminal activity from law enforcement scrutiny." His crimes included "stealing drug money and extorting protection payments" from the individuals he was sworn to protect and serve.

85.     The government revealed that, for years, Defendants Watts and Mohammed extorted tens of thousands of dollars in bribes from individuals at the Ida B. Wells public housing complex on numerous occasions as part of their duties with the CPD.

86.     During the sentencing hearing, the government urged Judge Sharon Johnson Coleman to "consider the other criminal conduct that the defendant [Watts] engaged in throughout the course of his career as a police officer," specifically noting that during the federal investigation, Watts "did other things such as putting a false case on the confidential source that was involved in our investigation. Watts had him arrested on drug charges. And the source . . . felt he had no chance of successfully fighting that case so he pled guilty to a crime he didn't commit." The federal prosecutor wondered aloud "how many times [Watts] might have done something similar when the government was not involved."

87.     Following the federal indictments of Watts and Mohammed, City officials made efforts to downplay the magnitude of Watts's criminal enterprise.

88.     Notwithstanding the evidence investigators had amassed over the years pointing to a wide, decade–long criminal enterprise, CPD Superintendent Garry McCarthy publicly stated, "There is nobody involved other than the two officers who were arrested." As described in more

detail below, McCarthy was wrong.

## The City's "Code of Silence"

89.    While the federal government was investigating Watts and his crew, a "code of silence" existed within the Chicago Police Department.

90.    Under this code, police officers are expected to conceal each other's misconduct, in contravention of their sworn duties, and penalties for breaking the code of silence within the CPD are severe.

91.    As one CPD officer has explained, "[The Chicago Police Academy told officers] over and over again we do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

92.    Pursuant to this "code of silence," each of the Defendant Officers concealed from Mr. Harrison information that Watts and his crew members were in fact engaged in a wide-ranging pattern of misconduct. Had this information been disclosed to Mr. Harrison, he would have used it to impeach the officers' accounts, which would have changed the outcome of the criminal proceedings instituted against him.

93.    Also, consistent with this "code of silence," the few people who stood up to Watts and his crew and/or attempted to report his misconduct were either ignored or punished, while Watts and his crew continued to engage in misconduct with impunity.

## The Careers of CPD Officers Daniel Echeverria and Shannon Spaulding are Nearly Ruined

94.    In or around 2006, two Chicago police officers, Daniel Echeverria and Shannon

– 11 –

Spaulding, learned credible information from arrestees that Watts and his crew were engaged in illegal drug activity.

95.     Officer Echeverria took the allegations seriously and reported them to a CPD supervisor. The supervisor made clear that he was not interested in hearing about the allegations, and he directed Echeverria not to document the allegations.

96.     Echeverria and Spaulding subsequently reported the allegations about Watts and his crew to the FBI. Soon thereafter, Echeverria and Spaulding began cooperating with the FBI and actively assisting the FBI with its investigation of Watts and his crew.

97.     When their cooperation became known to officers within their CPD chain of command, Spaulding and Echeverria were labeled "rats" within the Department, their lives were threatened, and they endured all manner of professional retaliation by members of the CPD.

98.     Spaulding and Echeverria subsequently sued the City for the retaliation they suffered for blowing the whistle on Watts and his crew. On the eve of trial in that case, the City settled for $2 million.

**CPD Officer Michael Spaargaren's Life is Threatened**

99.     Sometime in the mid-2000s, CPD Officer Michael Spaargaren was assigned to work with Watts in public housing.

100.     Spaargaren observed that Watts did not inventory drugs and money that officers seized during arrests, and Spaargaren confronted Watts about the misconduct.

101.     In response, Watts threatened to fabricate allegations of misconduct against Spaargaren and made veiled threats to kill him.

102.     A CPD lieutenant in the chain of command—James Spratte— subsequently warned Spaargaren to keep his mouth shut or his life would be in danger.

– 12 –

103.    Fearful for his life, Spaargaren opted to take a one-and-a-half-year leave of absence from CPD rather than continue to work under Watts.

### Citizen Complaints Went Nowhere

104.    Defendants Watts, Mohammed, and other members of Watts's tactical team accumulated hundreds of citizen complaints concerning violations of citizens' civil rights over the years. These complaints began well before the misconduct Defendants committed against Mr. Harrison. Despite the shocking number of citizen complaints directed against Watts and his team, the City did nothing to stop the misconduct.

105.    As for the complaints that the City bothered to investigate the City often failed to seek out known witnesses and corroborating evidence and even ignored corroborating evidence to instead side with officer's boilerplate denials over complainants and their witnesses—no matter how many citizens came forward with the same type of complaint.

106.    The Illinois Appellate Court criticized the City for its utter failure to address the misconduct of Watts and his team.

107.     In multiple instances, the City actually assigned Watts to investigate complaints made against him or members of the team he supervised.

### The City Turns a Blind Eye to the Clear Pattern of Alleged Misconduct that Emerged from Watts and His Crew

108.    Despite all of the evidence that was amassed over the years of a pattern and practice of criminal misconduct by Defendant Officers, the City never undertook its own investigation of the clear pattern that emerged.

109.    As City officials were aware, the purpose of the FBI investigation was to investigate and prosecute criminal activity, not to impose discipline and control of the City's

Police Department.

110.    Nothing about the FBI investigation relieved the City of its fundamental responsibility to supervise, discipline, and control its officers.

111.    Nevertheless, the City completely abdicated this responsibility, allowing the widespread misconduct to continue undeterred throughout the FBI's criminal investigation of Watts and his crew.

112.    During the FBI investigation, which spanned at least eight years, City officials had reason to believe that Watts and his crew were committing ongoing criminal activity on the streets—extorting drug dealers and framing citizens for crimes they did not commit—yet, City officials took no steps to prevent these abuses from occurring.

113.    Instead, the City officials let officers on Watts's crew continue to pursue criminal charges against citizens like Mr. Harrison and continue to fabricate false police reports and testify falsely against citizens like Mr. Harrison.

114.    City officials withheld information that they had about the officers' pattern of transgressions—information that citizens like Mr. Harrison could have used to impeach the corrupt officers and defend against the bogus criminal charges brought against them.

**Exonerations**

115.    After the extensive scope of Defendant Watts and his crew's corruption came to light, on September 12, 2017, a group of similarly–situated innocent victims filed a Consolidated Petition for Relief From Judgment and To Vacate Convictions Pursuant to 735 ILCS 5/2-1401 ("Consolidated Petition").

116.    On November 16, 2017, upon the State's motion, Judge LeRoy K. Martin, Jr. vacated and *nolle prossed* all of the convictions related to the fifteen (15) Petitioners named in the

Consolidated Petition.

117.    In commenting on the extraordinary decision to agree to vacate all of the convictions tied to Watts and his team, the head of Cook County State's Attorney's Office's Conviction Integrity Unit, Mark Rotert, stated that, "In these cases, we concluded, unfortunately, that police were not being truthful and we couldn't have confidence in the integrity of their reports and their testimony."

118.    On September 24, 2018, eighteen (18) other similarly–situated innocent victims were given a semblance of justice. Upon the State's motion, Judge LeRoy K. Martin, Jr. vacated 23 convictions, and the State *nolle prossed* all charges related to the convictions stemming from Watts and his team's wrongful arrests.

119.    Following this decision, Mr. Rotert explained that "these arrests were purely conjured . . . . [Watts and his team] were basically arresting people and framing them or were claiming they were involved in drug offenses that either didn't occur or didn't occur the way these police officers said."

120.    At a press conference where she stood with the 18 exonerated men, CCSAO elected State's Attorney Kim Foxx stated that "[t]he system owes an apology to the men who stand behind us."

121.    On November 2, 2018, seven (7) more victims had eight (8) additional convictions voluntarily dismissed by the CCSAO.

122.    In a Press Release, CCSA Foxx stated that Watts's and his team's "pattern of misconduct" caused his "to lose confidence in the initial arrests and the validity of these convictions."

123.    Referring to the exonerees as "victims," Ms. Foxx wished them "a path forward in

– 15 –

healing and justice."

124.    The CCSAO has since voluntarily dismissed additional convictions.

125.    On February 24, 2020, after another mass dismissal – in which Mr. Harrison was exonerated – and in reference to the Watts scandal, Ms. Foxx stated: "I think it's important that we acknowledge the harm that was caused when we talk about these cases. It's not just these I men. It's the erosion of the trust in the justice system when we allow for those [men] to be wrongfully convicted based on the misdeeds of corrupt law enforcement."

126.    The CCSAO will no longer call certain members of Watts's crew, including some of the Defendant Officers named herein, as witnesses in any pending or future matters due to concerns about their credibility and alleged involvement in misconduct.

127.    In November 2017, former Superintendent of the Chicago Police Department, Eddie T. Johnson, placed multiple members of Watts's crew on desk duty.

**Mr. Harrison's Damages**

128.    Because of the Defendants' acts and omissions, Mr. Harrison was subjected to police harassment and unfair criminal proceedings.

129.    The Defendant Officers' misconduct and false accusations subjected Mr. Harrison to a felony convictions and wrongful incarceration before he was exonerated.

130.    The pain and suffering caused by being wrongfully incarcerated has been significant. Mr. Harrison was deprived of the everyday pleasures of basic human life and his freedom was taken from him. Since then, Mr. Harrison has had to live with a felony record he did not deserve.

131.    As a result of the foregoing, Mr. Harrison has suffered emotional damages proximately caused by Defendants' wrongdoing.

– 16 –

## Count I: 42 U.S.C. § 1983 – Due Process

132.     Each paragraph of this Complaint is incorporated as if restated fully herein.

133.     In the manner described more fully above, Defendant Officers, while acting as investigators, individually, jointly, and in conspiracy with each other, deprived Plaintiff of his constitutional right to due process and a fair trial.

134.     In the manner described more fully above, Defendant Officers deliberately withheld exculpatory evidence from Plaintiff and from state prosecutors, among others, as well as knowingly fabricated false evidence, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

135.      Likewise, in the manner described more fully above, Defendants Philip J. Cline, Debra Kirby, Karen Rowan, and other as-yet-unidentified CPD supervisors, had knowledge of a pattern of misconduct by Watts and his team. These Defendant Supervisory Officers knew of a substantial risk that Watts and his team would violate the rights of Mr. Harrison and other residents and visitors of the Ida B. Wells complex, and they deliberately chose a course of action that allowed those abuses to continue, thereby condoning those abuses.

136.     The constitutional injuries complained of herein were proximately caused by the intentional misconduct of Defendant Supervisory Officers, or were proximately caused when Defendant Supervisory Officers were deliberately, recklessly indifferent to their subordinates' misconduct, knowing that turning a blind eye to that misconduct would necessarily violate Plaintiff's constitutional rights.

137.     In addition, Defendant Supervisory Officers themselves concealed exculpatory evidence from Mr. Harrison, specifically information about Watts and his team's pattern of misconduct. In this way, Defendant Supervisory Officers violated Mr. Harrison's due process right

to a fair trial deliberately and with reckless disregard for Mr. Harrison's rights.

138.    Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, depriving him of his constitutional right to due process and a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

139.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Mr. Harrison's clear innocence.

140.    Defendants' actions were taken under color of law and within the scope of their employment.

141.    The City of Chicago is also directly liable for the injuries described in this Count because the City and CPD maintained official policies and customs that were the moving force behind the violation of Plaintiff's rights, and also because the actions of the final policymaking officials for Defendant City of Chicago and CPD were the moving force behind the violation of Plaintiff's rights.

142.    At all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Chicago maintained a system that violated the due process rights of criminal defendants like Mr. Harrison by concealing exculpatory evidence of Chicago police officers' patterns of misconduct.

143.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Chicago had notice of a widespread practice by its officers and agents under which criminal suspects, such as Mr. Harrison, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and were

deprived of liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

144.    As a matter of both policy and practice, Defendant City directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise, control, and discipline its police officers, such that its failure to do so manifests deliberate indifference. Defendant City's practices lead police officers in the City of Chicago to believe that their actions will never be scrutinized and, in that way, directly encourage further abuses such as those that Mr. Harrison endured.

145.    The above-described widespread practices, which were so well settled as to constitute the de facto policy of the City of Chicago, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. These widespread practices were allowed to flourish because Defendant City and the CPD declined to implement sufficient policies or training, even though the need for such policies and training was obvious. Defendant City and the CPD also declined to implement any legitimate mechanism for oversight or punishment of officers, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

146.    Furthermore, the misconduct described in this Complaint was undertaken pursuant to the policy and practices of Defendant City in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago and the CPD, or were actually committed by persons with such final policymaking authority.

147.    Indeed, municipal policymakers have long been aware of Defendant City's policy

– 19 –

and practice of failing to properly train, monitor, investigate, and discipline misconduct by its police officers, but have failed to take action to remedy the problem.

148.    For example, at a City Council hearing on September 28, 1999, in response to two high-profile unjustified police shootings, then Superintendent Terry Hillard noted the need for better in-service training on the use of force, early detection of potential problem officers, and officer accountability for the use of force.

149.    In June 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

150.    In 2001, the Justice Coalition of Greater Chicago (JCGC), a coalition of more than a hundred community groups, confirmed the findings of that resolution, concluding that the CPD lacked many of the basic tools necessary to identify, monitor, punish, and prevent police misconduct. The JCGC findings were presented to Mayor Richard Daley, Superintendent Hillard, and the Chicago Police Board.

151.    Despite municipal policymakers' knowledge of the City's failed policies and practices to adequately train, supervise, investigate, discipline, and control its police officers, nothing was done to remedy these problems.

152.    As a result, the CPD has continued to respond to complaints of police misconduct inadequately and with undue delay, and has continued to recommend discipline in a disproportionately small number of cases.

153.    Indeed, by its own admissions, more than 99% of the time when a citizen complains that his or his civil rights were violated by police officers, the City sides with the police officer and

concludes that no violation occurred.

154.    Notably, Defendant Watts and his crew are not the first Chicago police officers who were allowed to abuse citizens with impunity over a period of years while the City turned a blind eye.

155.    For instance, in 2001, Chicago Police Officer Joseph Miedzianowski was convicted on federal crime charges, including racketeering and drug conspiracy. The jury found that Miedzianowski engaged in corruption for much of his 22-year police career, using street informants to shake down drug dealers and sell drugs.

156.    Miedzianowski, like Defendant Officers in this case, had accumulated scores of complaints over the years. As the Appellate Court has stated, the Defendant City "did nothing to slow down the criminals. Instead, it informed the corrupt officers about the complaint and named the source." The Defendant City deemed such complaints unfounded or not sustained.

157.    Likewise, in 2011, Chicago police officer Jerome Finnigan was convicted and sentenced on federal criminal charges, including a charge of attempting to hire someone to kill a police officer who Finnigan believed would be a witness against him on his own corruption charges in state court.

158.    Finnigan was part of a group of officers in Defendant City's Special Operations Section that carried out robberies, home invasions, unlawful searches and seizures, and other crimes.

159.    Finnigan and his crew engaged in their misconduct at about the same time that Mr. Harrison was targeted by Defendant Watts and his crew.

160.    Finnigan, like Defendant Officers in this case, had accumulated scores of citizen complaints over the years, which Defendant City routinely deemed unfounded or not sustained.

161.    At his sentencing hearing in 2011, Finnigan stated, "You know, my bosses knew what I was doing out there, and it went on and on. And this wasn't the exception to the rule. This was the rule."

162.    In the case of *Klipfel v. Bentsen*, No. 94-cv-6415 (N.D. Ill), a federal jury found that, as of 1994, the CPD maintained a code of silence that facilitated misconduct committed by Miedzianowski.

163.    Likewise, in the case of *Obrycka v. City of Chicago et al.*, No. 07 CV 2372 (N.D. Ill.), a jury found that, as of February 2007, "the City [of Chicago] had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

164.    The same code of silence in place at the CPD during the time periods at issue in the *Klipfel* case and in the *Obrycka* case was also in place during the times complained of herein.

165.    Indeed, the problems found to exist by the jury in *Klipfel* and *Obrycka* continue to this day. In December 2015, then Mayor Rahm Emanuel acknowledged that a "code of silence" exists within the Chicago Police Department that encourages cover-ups of police misconduct, and that the City's attempts to deal with police abuse and corruption have never been adequate.

166.    Even more recently, in January 2020, the interim head of the Chicago Police Department also acknowledged the code of silence.

167.    The policies, practices, and customs set forth above were the moving force behind the constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous injuries and damages set forth above.

168.    Defendant City's investigation of complaints is characterized by unreasonably long delays, despite the relatively straightforward nature of many misconduct claims.

169.    Although Defendant City has long been aware that its supervision, training, and

discipline of police officers is entirely inadequate, Defendant City has not enacted any substantive measures to address that deficiency.

170.    Instead, Defendant City continues to inadequately investigate citizen complaints and fail to take action against officers when necessary. It has also failed to modify its officer training programs to reduce misconduct against Chicago residents or to implement a system to identify and track repeat offenders, districts, or units.

171.    Plaintiff's injuries were caused by CPD officers, agents, and employees of Defendant City of Chicago, including, but not limited to, the individually named Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**Count II: 42 U.S.C. § 1983 – Fourth Amendment Claim**

172.    Each paragraph of this Complaint is incorporated as if restated fully herein.

173.    In the manner described more fully above, Defendants, while acting as investigators, individually, jointly, and in conspiracy with each other, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

174.    In doing so, Defendants caused Plaintiff to be unreasonably seized without probable cause and deprived of his liberty, in violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments.

175.    The false judicial proceedings against Plaintiff were instituted and continued maliciously, resulting in injury.

176.    Defendants deprived Plaintiff of fair state criminal proceedings, including the

– 23 –

chance to defend himself during those proceedings, resulting in a deprivation of his liberty.

177.    In addition, Defendants subjected Plaintiff to arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent. This was accomplished through Defendants' fabrication and suppression of evidence.

178.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and with total disregard of the truth and of Plaintiff's clear innocence.

179.    The Defendants' actions were taken under color of law and within the scope of their employment.

180.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

181.    Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above.

## Count III: 42 U.S.C. § 1983 – Failure to Intervene

182.    Each paragraph of this Complaint is incorporated as if restated fully herein.

183.    In the manner described more fully above, during the constitutional violations described herein, Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

184.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and with

– 24 –

total disregard of the truth and of Plaintiff's innocence.

185.    The Defendants' actions were taken under color of law and within the scope of their employment.

186.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

187.    Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above.

## Count IV: 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

188.    Each paragraph of this Complaint is incorporated as if restated fully herein.

189.    Prior to Plaintiff's conviction, all of the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described above.

190.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability by depriving Plaintiff of his rights.

191.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

192.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and with

– 25 –

total disregard of the truth and of Plaintiff's innocence.

193.    The Defendants' actions were taken under color of law and within the scope of their employment.

194.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

195.    Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above.

**Count V: Illinois Law – Malicious Prosecution**

196.    Each paragraph of this Complaint is incorporated as if restated fully herein.

197.    In the manner described more fully above, Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

198.    In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

199.    The Defendants' actions were taken under color of law and within the scope of their employment.

200.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**Count VI: Illinois Law – Intentional Infliction of Emotional Distress**

– 26 –

201.    Each paragraph of this Complaint is incorporated as if restated fully herein.

202.    The actions, omissions, and conduct of Defendant Officers, as set forth above, were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

203.    The Defendants' actions were taken under color of law and within the scope of their employment.

204.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**Count VII: Illinois Law – Civil Conspiracy**

205.    Each paragraph of this Complaint is incorporated as if restated fully herein.

206.    As described more fully in the preceding paragraphs, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of his rights.

207.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

208.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and with total disregard of the truth and of Plaintiff's innocence.

209.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered

loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count VIII: Illinois Law – Respondeat Superior

210.    Each paragraph of this Complaint is incorporated as if restated fully herein.

211.    While committing the acts alleged in the preceding paragraphs, Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

212.    Defendant City of Chicago is liable as principal for all torts committed by their agents.

### Count IX: Illinois Law – Indemnification

213.    Each paragraph of this Complaint is incorporated as if restated fully herein.

214.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment.

215.    Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff Stefon Harrison respectfully requests that this Court enter a judgment in his favor and against the City of Chicago, former Chicago Police Sergeant Ronald Watts, former Chicago Police Officer Kallatt Mohammed, Officer Alvin Jones, Officer Elsworth Smith Jr., Officer Brian Bolton, Officer Robert Gonzalez, Philip J. Cline, Debra Kirby, Karen Rowan, and other as-yet-unidentified officers of the Chicago Police Department, awarding compensatory damages, attorneys' fees, costs and expenses against each Defendant, punitive damages against each of the individual Defendants, and any other relief this Court deems just and

appropriate.

## JURY DEMAND

Plaintiff, Stefon Harrison, hereby demands a trial by jury pursuant to Federal Rule of Civil

Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/*Sean Starr*
*One of Plaintiff's Attorneys*

Jon Loevy
Arthur Loevy
Scott Rauscher
Joshua Tepfer
Theresa Kleinhaus
Sean Starr
Mariah Garcia
LOEVY & LOEVY
311 North Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
sean@loevy.com